IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TEXAS FARM BUREAU, <br><br> MARK CADRA, and <br><br> TIMOTHY ASSITER, <br><br>        Plaintiffs, <br><br> v. <br><br> THE UNITED STATES DEPARTMENT OF AGRICULTURE, <br><br> BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture, <br><br> WILLIAM BEAM, in his official capacity as Administrator of the Farm Service Agency, and <br><br> THE UNITED STATES OF AMERICA, <br><br>        Defendants. | Case No. 2:25-cv-00181 |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Plaintiffs are farmers and ranchers who wake up every day with one goal in mind: to feed America. These are difficult jobs. Hard work is the primary job requirement. Or at least it ought to be. Instead, for decades, Congress has prioritized the skin color and sex of farmers and ranchers when it created many of the programs and benefits offered by the United States Department of Agriculture (USDA).

2. Congress has long required USDA engage in the "sordid business [of] divvying us up by race," by requiring it to provide unequal benefits for those it deems "socially disadvantaged." This results in USDA giving less benefits to farmers and ranchers who are neither its preferred races nor women.[1] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part). This lawsuit focuses on the Noninsured Crop Disaster Assistance Program (NAP), 7 U.S.C. § 7333, codified at 7 C.F.R. § 1437.7, as both individual Plaintiffs were discriminated against under it.

3. Plaintiffs are seeking class certification to challenge these and all other USDA programs that discriminate against farmers and ranchers based on race or sex using the "socially disadvantaged" category.

4. Unfortunately, this is not the first time that blatant discrimination in USDA's programs forced the courts of the Northern District of Texas to remind regulators that federal law exists. *See Strickland v. USDA*, 736 F. Supp. 3d 469, 487 (N.D. Tex. 2024) (enjoining eight disaster relief programs that provided additional benefit to "socially disadvantaged" farmers and ranchers); *Miller v. Vilsack*, No. 21-CV-0595, 2021 U.S. Dist. LEXIS 264778, at *35 (N.D. Tex. July 1, 2021) (certifying two classes of farmers who experienced discrimination under USDA's "socially disadvantaged" category and preliminarily enjoining USDA from discriminating based on race in administering section 1005 of the American Rescue Plan Act). The Northern District of Texas is not alone. *See, e.g.*, *Holman v. Vilsack*, 127 F.4th 660, 663 (6th Cir. 2025) (Thapar, J., dissenting from denial of rehearing en banc) (discussing injunction against USDA's race discrimination under

---

[1] The preferred races never vary. *See* 7 C.F.R. § 718.2 (defining "socially disadvantaged" as (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women); 7 C.F.R. § 718.1(a) (making that definition applicable to all programs operated by the Farm Service Agency).

Section 1005 of the American Rescue Plan Act); *Ultima Servs. v. USDA*, No. 2:20-cv-00041, 2023 U.S. Dist. LEXIS 124268 (E.D. Tenn. July 19, 2023) (enjoining USDA from using a rebuttable presumption that certain races should receive favoritism in awarding government contracts); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021) (enjoining USDA's race discrimination under section 1005 of the American Rescue Plan Act); *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) (same).

5. The "socially disadvantaged" category that Congress created in Title 7 and demanded USDA administer has never withstood judicial scrutiny. Not once. Yet it continues to be enforced. And Congress shows no sign of purging Title 7 of this discriminatory classification. That "demeans us all." *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring in part and dissenting in part). If "[e]liminating racial discrimination means eliminating all of it," the time to do away with USDA's discriminatory category came and went long ago. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 206 (2023).

**PARTIES**

6. Plaintiff Cadra lives in Wheeler County, Texas, and operates a ranch where he grows grass, sorghum, and other grains.

7. Mr. Cadra used and will use NAP to insure his crops, has done so for many years, and intends to continue doing so.

8. Mr. Cadra is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, and so he is not eligible for the same benefits he would be under NAP if he were of a different race or sex.

9. Plaintiff Timothy Assiter lives in Floyd County, Texas, and operates a farm where he grows pumpkins and squash.

10. Mr. Assiter used and will use NAP to insure his crops, has done so for many years, and intends to continue doing so.

11. Mr. Assiter is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, and so he is not eligible for the same benefits he would be under NAP if he were of a different race or sex.

12. Plaintiff Texas Farm Bureau is a membership and advocacy organization for American farmers and ranchers headquartered in Waco, Texas, that advocates to both state and federal governments for policy changes to improve and protect domestic agricultural production.

13. Plaintiff Texas Farm Bureau is more than 500,000 member-families strong.

14. Many of Plaintiff Texas Farm Bureau's members have faced discrimination based on their race and sex through USDA's "socially disadvantaged" category.

15. Both individual Plaintiffs, Mr. Assiter and Mr. Cadra, are members of the Texas Farm Bureau.

16. Defendant USDA is a federal executive department. Congress gave USDA authority to administer NAP, including the power to issue regulations. USDA then issued regulations implementing the program. It can be sued under the Administrative Procedure Act because this suit seeks relief other than monetary damages and states a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority. *See* 5 U.S.C. § 702.

17. Defendant Brooke Rollins is the Secretary of Agriculture. She is responsible for overseeing USDA, including the Farm Service Agency (FSA). She is sued in her official capacity.

18. Defendant William Beam is the current Administrator for USDA's Farm Service Agency. At all times relevant to this complaint, his responsibilities included administering NAP. He is sued in his official capacity.

19. Defendant United States of America is a government entity. It can be sued under the Administrative Procedure Act (APA) because this suit seeks relief other than monetary damages and states a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority. *See* 5 U.S.C. § 702.

## JURISDICTION AND VENUE

20. This case arises under both the Fifth Amendment to the United States Constitution and the Administrative Procedure Act. *See* 5 U.S.C. § 701 *et seq*.

21. The Court has jurisdiction over this complaint under 28 U.S.C. § 1331 (federal question) because this case presents substantial questions of federal law, specifically whether "socially disadvantaged" programs, including NAP, run by USDA violate the United States Constitution's guarantee of equal protection of the laws and the APA. *See* 5 U.S.C. § 701 *et seq*.

22. This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57.

23. Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in this district and a plaintiff resides in this district.

## STATEMENT OF FACTS

*The Noninsured Crop Disaster Assistance Program (NAP)*

24.     NAP is a program administered by USDA that provides additional benefits to farmers who are socially disadvantaged, veteran, limited resource, or beginning, pursuant to congressional directive

25.     NAP provides that the Secretary of Agriculture "shall operate a noninsured crop disaster assistance program to provide coverages based on individual yields . . . ." 7 U.S.C. § 7333(a)(1)(A).

26.     NAP provides catastrophic risk coverage, defined as "coverage for a 50 percent loss in yield, on an individual yield or area yield basis, indemnified at 55 percent of the expected market price, or a comparable coverage," to food and fiber crops that are not covered by the Federal Crop Insurance Act, 7 U.S.C. § 1508. 7 U.S.C. § 7333(a)(2)(A).

27.     It also provides catastrophic risk coverage to "floricultural, ornamental nursery, and Christmas tree crops, turfgrass sod, seed crops, aquaculture (including ornamental fish), sea grass and sea oats, camelina, sweet sorghum, biomass sorghum, and industrial crops." *Id.* § 7333(a)(2)(B).

28.     To apply for and receive NAP coverage, a farmer must pay a service fee of up to $1,950. *See* 7 U.S.C. § 7333(k)(1).

29.     Congress directed that the Secretary of Agriculture "shall waive the service fee . . . in the case of . . . [a] socially disadvantaged farmer . . . ." 7 U.S.C. § 7333(k)(2); *see also* 7 C.F.R. § 1437.7(g) (waiving service fee for socially disadvantaged farmers and giving them 50 percent off any additional coverage purchased).

30. NAP provides the same additional benefits to beginning, limited resource, and veteran farmers. 7 U.S.C. § 7333(k)(2); *see also* 7 C.F.R. § 1437.7(g).

31. By statute, "socially disadvantaged farmer or rancher" means "a farmer or rancher who is a member of a socially disadvantaged group." 7 U.S.C. § 2003(e)(2).

32. By statute, "socially disadvantaged group" means "a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2003(e)(1).

33. USDA's Farm Service Agency regulations define "socially disadvantaged" farmer or rancher to include the following "and no others" unless separately approved by the Deputy Administrator:

> (1) American Indians or Alaskan Natives,
>
> (2) Asians or Asian-Americans,
>
> (3) Blacks or African-Americans,
>
> (4) Hispanics or Hispanic-Americans,
>
> (5) Native Hawaiians or other Pacific Islanders, and
>
> (6) Women.

7 C.F.R. §§ 718.2 (defining the term), 1437.3 (applying the definitions in Part 718 to the NAP program).

34. That regulatory definition cites 7 U.S.C. § 2003 as the source of its authority. *See* 7 C.F.R. § 718.

35. A "beginning" farmer or rancher is defined as a person who has not operated a farm or ranch for more than 10 years and materially and substantially participates in the operation. 7 C.F.R. § 718.2; *see also* 7 U.S.C. § 2279(a)(2).

7

36. A "limited resource" farmer or rancher is defined as a farmer whose direct or indirect gross farm sales, adjusted for inflation, did not exceed $176,800 in either of the two immediately preceding calendar years, and whose total household income was at or below the national poverty level for a family of four. *See* 7 C.F.R. § 718.2.

37. A "veteran" is defined as a person who has served in the Armed forces and who has not operated a farm or a ranch for more than 10 years or became a veteran as defined in 38 U.S.C. § 101(10) within the last 10 years. 7 U.S.C. § 2279(a)(7).

38. In short, there are four ways to receive enhanced NAP benefits: (1) be a new farmer ("beginner"); (2) be below the poverty line ("limited resource"); (3) serve honorably in the United States Army, Navy, Air Force, Marine Corps, or Coast Guard ("veteran"); or (4) be on the list of races or the one sex USDA designated as "socially disadvantaged."

*The Form CCC-860: How USDA Classifies Farmers by Race and Sex*

39. USDA allows farmers and ranchers to record their race and sex with the agency through Form CCC-860.

40. To be classified as "socially disadvantaged," a farmer or a rancher must submit a Form CCC-860 to the USDA. U.S. Dep't of Agric. Commodity Credit Corp., CCC-860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification (2020), https://perma.cc/W7BF-Q93Q.

41. Form CCC-860 also allows farmers and ranchers to classify themselves as a veteran (based on veteran status), a beginner (started farming in past 10 years), and/or limited resource (based on low annual income). *Id.*

42. Form CCC-860 also allows farmers and ranchers to classify themselves as socially disadvantaged, which USDA expressly defines as only members of certain races and one sex. *Id.*

8

43. The following is an image from Form CCC-860 that depicts the definition of "socially disadvantaged" farmer or rancher and the races and sex that the definition includes:

> **A. Socially Disadvantaged Farmer or Rancher:**
>
> A socially disadvantaged farmer or rancher is a farmer or rancher who is a member of a group whose members have been subject to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. Groups include: American Indians or Alaskan Natives, Asians or Asian Americans, Blacks or African Americans, Native Hawaiians or other Pacific Islanders, Hispanics, and women (for those selecting a group that includes gender). Note that if applicant only checks "women" without also selecting the other category the selection does not make applicant socially disadvantaged for conservation programs.
>
> For entities requesting to be considered socially disadvantaged, at least 50% of the interest must be held by socially disadvantaged individuals.

44. Form CCC-860 defines "socially disadvantaged" farmer or rancher to include the following races and sex:

    (1) American Indians or Alaskan Natives,

    (2) Asians or Asian-Americans,

    (3) Blacks or African-Americans,

    (4) Native Hawaiians or other Pacific Islanders,

    (5) Hispanics,

    (5) and women.

*Id.*

45. For most USDA programs, including NAP, women qualify as socially disadvantaged. *See* 7 C.F.R. § 718.2; 7 C.F.R. § 718.1(a).

*Injury to Plaintiffs*

46. NAP is funded and continues to operate.

47. As of the date of this filing, USDA maintains instruction on its website with directions on how to apply for NAP coverage, stating that detailed instructions and deadlines are currently available through the local Farm Service Agency (FSA) office.

48. Defendants injured Plaintiff Cadra through NAP by excluding him from benefits based on his race and sex.

49. Mr. Cadra operates a ranch in Wheeler County, Texas, where he grows grass, sorghum, and other grains.

50. Mr. Cadra's grass and grains cannot be insured through traditional federal crop insurance and so must be insured through NAP.

51. He insures those crops through NAP and has done so as far back as crop year 2021.

52. To insure his crops using NAP for crop year 2025, he paid an $825 service fee.

53. Mr. Cadra intends to use NAP for the next crop year and for the foreseeable future.

54. Mr. Cadra is a white man and thus does not qualify as socially disadvantaged.

55. Mr. Cadra is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify for enhanced benefits other than socially disadvantaged.

56. If Mr. Cadra were a woman, American Indian, Alaskan Native, Asian, Asian-American, black, African-American, Hispanic, Hispanic-American, Native Hawaiian, or Pacific Islander, he would qualify for enhanced benefits.

57. If Mr. Cadra were classified as socially disadvantaged, he would not have paid the $825 service fee and would not have to pay it going forward.

58. This disparate treatment stigmatizes and demeans him on an ongoing basis.

59. Mr. Cadra is thus disadvantaged because of his race and sex.

60. Defendants injured Plaintiff Assiter through NAP by excluding him from benefits based on his race and sex.

61. Mr. Assiter operates a farm in Floyd County, Texas, where he grows pumpkins and squash.

62. Mr. Assiter's pumpkins and squash cannot be insured through traditional federal crop insurance and so must be insured through NAP.

63. He insures those crops through NAP and has done so as far back as crop year 2019.

64. To insure his crops using NAP for crop year 2025, he paid an $825 service fee.

65. Mr. Assiter also elected to buy up coverage on his pumpkins for which he owes a premium.

66. Mr. Assiter intends to use NAP for the next crop year and for the foreseeable future.

67. Mr. Assiter is a white man and thus does not qualify as socially disadvantaged.

68. Mr. Assiter is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify for enhanced benefits other than socially disadvantaged.

69. If Mr. Assiter were a woman, American Indian, Alaskan Native, Asian, Asian-American, black, African-American, Hispanic, Hispanic-American, Native Hawaiian, or Pacific Islander, he would qualify for enhanced benefits.

70. If Mr. Assiter were classified as socially disadvantaged, he would not have paid the $825 service fee and would not going forward.

71. If Mr. Assiter were classified as socially disadvantaged, he would have received a 50 percent discount on the premiums for his buy-up coverage and would going forward.

72. This disparate treatment stigmatizes and demeans him on an ongoing basis.

73. Mr. Assiter is thus disadvantaged because of his race and sex.

74. Plaintiff Texas Farm Bureau is a membership organization whose members, including Mr. Assiter and Mr. Cadra, have been discriminated against by USDA based on their race and sex using the "socially disadvantaged" category in NAP and many other programs.

75. If those members were classified as socially disadvantaged, they would not have been required to pay the NAP service fee and would not have to pay it going forward.

76. If those members were classified as socially disadvantaged, they would have received a 50 percent discount on their premiums for buy-up coverage and would receive that discount going forward.

77. This disparate treatment stigmatizes and demeans Plaintiff Texas Farm Bureau's members on an ongoing basis.

## CAUSE OF ACTION

### CLAIM FOR RELIEF
(Fifth Amendment Equal Protection Violation – Race Discrimination)

78. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

79. NAP discriminates based on race in violation of the Fifth Amendment to the United States Constitution.

80. In order to justify a racial preference in a benefits program, the government must demonstrate that (1) it is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," that remain unremedied, *SFFA*, 600 U.S. at 207; (2) its program is narrowly tailored and thus, cannot rely on categories that are "imprecise," "overbroad," and "arbitrary or undefined," *id*. at 216; (3) it does not use race as a "negative," *id*. at 218–19, or as a "stereotype," *id*. at 220–21; and (4) its programs have a "logical end point," *id.* at 221.

81. Mr. Assiter and Mr. Cadra were charged service fees that a similarly situated farmer of a different race would not have been.

82. Mr. Assiter paid more in insurance premiums than a similarly situated farmer of a different race would have.

83. Many of Plaintiff Texas Farm Bureau's members, including Mr. Assiter and Mr. Cadra, have faced the same discriminatory treatment from Congress and USDA under its "socially disadvantaged" category based on their race, including paying the service fee and paying more in insurance premiums.

84. Plaintiffs have used USDA programs with a preference for the races defined as "socially disadvantaged" by Congress and USDA, including NAP, in the past, and will again in the future.

85. Defendants will continue to enforce their racial preference for "socially disadvantaged" races, in NAP and other USDA programs.

86. Additionally, Plaintiffs sustained harm by receiving unequal treatment from the government based on their race. This is an ongoing stigmatic harm that results in "irreparable" damage. *See Strickland*, 736 F. Supp. 2d at 484 ("Harm is irreparable when equal protection is at issue.").

87. The racial classifications of the programs do not satisfy strict scrutiny. *Adarand Constructors v. Peña*, 515 U.S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.").

88. Defendants do not have a compelling interest in providing greater benefits to farmers and ranchers simply based on their membership in a particular race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) ("This Court never has held that societal discrimination alone is sufficient to justify a racial classification.").

89. Defendants' preference for farmers of certain races is not narrowly tailored to any compelling interest. *See Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278, 2024 U.S.

Dist. LEXIS 38050, at *99 (N.D. Tex. Mar. 5, 2024) ("It doesn't matter if it's the easiest, most administrable, most well-intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest."); *see also Strickland*, 736 F. Supp. 2d at 483 (explaining that the "socially disadvantaged" racial categories fail narrow tailoring because they ignore race-neutral alternatives, are both under- and over-inclusive, and negatively impact third parties).

90. The programs are not narrowly tailored since they are both underinclusive—they do not provide additional benefits to groups that have histories of discrimination in the United States, such as Jewish-Americans, Arab-Americans, Italian-Americans, Slavic-Americans, and Irish-Americans—and overinclusive—they include farmers and ranchers who may meet the racial qualifications, but who have never suffered discrimination on that basis or are wealthy and not in danger of catastrophe absent additional disaster relief.

91. Even if the programs satisfy strict scrutiny, they still violate the Constitution's "twin commands" of equality because they use Plaintiffs' race as a negative and they use race to stereotype, specifically by assuming that USDA's preferred races suffered discrimination at its hands in the past and that other races did not. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (*SFFA*), 600 U.S. 181, 218 (2023) (explaining that, in addition to their inability to satisfy strict scrutiny, Harvard and UNC also "fail[ed] to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype").

## SECOND CLAIM FOR RELIEF
### (Fifth Amendment Equal Protection Violation – Sex Discrimination)

92. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

93. NAP discriminates based on sex in violation of the Fifth Amendment to the United States Constitution.

94. To justify a preference based on sex, the discrimination must be substantially related to an exceedingly persuasive objective beyond general claims of societal sex discrimination. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 727–29 (1982).

95. Mr. Assiter and Mr. Cadra were charged service fees that a similarly situated farmer of a different sex would not have been.

96. Mr. Assiter paid more in insurance premiums than a similarly situated farmer of a different sex would have.

97. Many of Plaintiff Texas Farm Bureau's members, including Mr. Assiter and Mr. Cadra, have faced the same discriminatory treatment based on their sex, including paying the service fee and paying more in insurance premiums.

98. Plaintiffs will continue to experience this discrimination in the future.

99. Additionally, Plaintiffs sustained harm by receiving unequal treatment based on their sex. This is an ongoing stigmatic harm that results in "irreparable" damage. *See Strickland*, 736 F. Supp. 2d at 484 ("Harm is irreparable when equal protection is at issue.").

100. Defendants' preference for women is not substantially related to any exceedingly persuasive objective. *See id.* (explaining USDA's preference for women in the "socially disadvantaged" category is both under- and over-inclusive and merely advanced a general desire to remedy societal inequities that is insufficient to justify discrimination).

101. General claims of societal sex discrimination cannot justify the discrimination.

102. The sex discrimination is both underinclusive and overinclusive—it fails to include farmers who are not women but who have suffered discrimination based on their sex and it does include farmers who are women but who have never suffered discrimination based on their sex.

## CLASS-ACTION ALLEGATIONS

103. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

104. Plaintiffs Mark Cadra and Tim Assiter bring this class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all farmers and ranchers in the United States who are encountering, or who will encounter, race or sex discrimination from USDA based on their exclusion from its "socially disadvantaged farmer or rancher" designation and have been or will be denied benefits or program access on that basis.

105. Plaintiffs Mark Cadra and Tim Assiter seek to represent a class of all farmers and ranchers in the United States who are currently excluded from USDA's "socially disadvantaged" category.

106. The number of individuals in this class makes joinder of the individual class members impractical.

107. There are questions of law common to the class, including, but not limited to:

   a. whether the Constitution allows the exclusion of farmers from NAP on account of their race or sex;

   b. whether the Constitution ever permits USDA to discriminate based on race or sex in the broad manner it has throughout its programs;

   c. whether USDA's prior discrimination has been remediated, either under court-ordered settlements or under the recently enacted § 22007 program, Inflation

      Reduction Act of 2022, Pub. L. 117-169, § 22007(e) (2022) (appropriating $2.2 billion for victims of USDA's past discrimination);

d. whether the definition of "socially disadvantaged" is overinclusive;

e. whether the definition of "socially disadvantaged" is underinclusive;

f. whether USDA's evidence of a compelling interest shows anything more than a mere statistical disparity between various races or sex;

g. whether Congress's definitions satisfy the "twin commands" of equal protection as required by *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (*SFFA*), 600 U.S. 181, 218 (2023) (explaining that, in addition to their inability to satisfy strict scrutiny, Harvard and UNC also "fail[ed] to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype");

h. whether Congress's and USDA's race and sex preferences have a "logical end point," *id.* at 22;

i. whether the races and sex favored under USDA's definition are narrowly tailored, *see SFFA*, 600 U.S. at 216 (calling categories like these "imprecise," "overbroad," and "arbitrary or undefined");

j. whether USDA has any evidence for some of the favored races, such as Native Alaskans or Japanese-Americans.

k. whether USDA's favored races are defined with enough precision.

    108. Plaintiffs Mark Cadra and Tim Assiter's claims are typical of other members of the class. Each of them wishes to stop their exclusion from the benefits of federal programs on account of their race or sex.

109. Plaintiffs Mark Cadra and Tim Assiter adequately represent the interests of the class, and they have no interests antagonistic to the class.

110. A class action is appropriate under Rule 23(b)(2) because Defendants are acting on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the whole class.

111. The relief sought is appropriate for the class as a whole, as Plaintiffs demand an injunction halting the usage of this discriminatory definition and prohibiting USDA from promulgating any further definitions that implement it; a declaratory judgment against the "socially disadvantaged" definitions in Title 7 and accompanying regulations, determining they are unconstitutional; and any other relief that may be appropriate. This relief would be equally consequential to the entire class.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

A. Certify a class of all persons in the United States who are currently or will in the future be excluded from USDA's "socially disadvantaged" category under one or more programs on the basis of race or sex;

B. Enter a declaratory judgment that the race and sex preferences in Title 7 and accompanying regulations are unconstitutional under the Equal Protection principles protected by the Due Process Clause of the Fifth Amendment to the United States Constitution;

C. Enter an order preliminarily and permanently enjoining Defendants from enforcing or implementing race or sex preferences;

D. Award Plaintiffs such costs and attorneys' fees as allowed by law;

E. Grant such other and further relief as the Court deems appropriate.

Dated: <u>August 8, 2025</u>.                    Respectfully submitted,

 /s/ Benjamin I. B. Isgur
BENJAMIN I. B. ISGUR
  Virginia Bar No. 98812
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
(770) 977-2131
bisgur@southeasternlegal.org

MIKE BYRD
  Texas Bar No. 03561450
Michael L. Byrd & Associates
7816 Orlando Avenue
Lubbock, Texas 79423
Telephone: (806) 788-0181
Facsimile: (806) 788-0187
mbyrd@byrdfirm.com

*Attorneys for Plaintiffs*